**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

UNITED STATES OF AMERICA  )
          )
    vs.      )  **2:04cr320**
          )  **Electronic Filing**
DAVID WONTA FITZGERALD  )

## MEMORANDUM ORDER

AND NOW, this **15** day of March, 2006, upon due consideration of defendant's motion to suppress (Doc. No, 29) and the record developed in conjunction therewith, IT IS ORDERED that the motion be, and the same hereby is, granted, and the gun and marijuana seized on September 2, 2003, are suppressed from use in the government's case-in-chief.

Defendant's motion raises two issues: whether defendant had a reasonable expectation of privacy in 2103 Palisades Plaza in the early morning hours when local police officers attempted to serve a warrant for defendant's arrest at that location and were denied entry by the leaseholder, and, if so, whether the protective sweep of the premises conducted after defendant's arrest just outside the apartment objectively was reasonable under the Fourth Amendment. A hearing was held and the testimony has been transcribed. Careful review of the entire record leads to the conclusion that each area of inquiry must be resolved in defendant's favor.

The parties agree that defendant's expectation of privacy in 2103 Palisades Plaza is dependent upon whether he was an overnight guest on the evening of September 1, 2003. See Minnesota v. Olson, 495 U.S. 91, 96-97 (1990) ("Olson's status as an overnight guest is alone enough to show that he had an expectation of privacy in the home that society is prepared to recognize as reasonable."). Even when the record is read in the light most favorable to the government, the conclusion that defendant was an overnight guest is the only one that can be reached. Defendant was known to the police to be on the run and to move from location to location without any real permanent place of abode. Defendant had a young child with the leaseholder and occupant of 2103 Palisades Plaza, Cheri Carter, and came to the residence

prior to midnight to visit his daughter.    The most reliable rendition of Cheri Carter's account of the events of that evening indicates defendant arrived around ten or ten-thirty, spent time with his daughter, retired to the bedroom after his daughter fell asleep, had sex with Cheri Carter, and then went to sleep until the two awoke to the knocking of the local officers.

All objective evidence indicates the encounter was an overnight visit. Shortly after defendant arrived Cheri Carter spotted a handgun in his waistband and expressed concern for the safety of her children. While she expressed concern, she did not ask him to leave, which she undoubtedly had the authority to do. Defendant removed his shoes and the handgun, and placed the handgun in one of his shoes. Thereafter, he moved his shoes and handgun into the master bedroom. After visiting with his daughter, defendant fell asleep in a living room chair, and then retired to the master bedroom where he subsequently was joined by Cheri Carter. A few hours later the two were in bed sleeping and Officer Mercalde had to knock for several minutes before Cheri Carter came to the door and asked who was knocking. After identifying himself, Cheri Carter did not permit Officer Mercalde to enter the premises. It was after this point in time that defendant was out of bed moving about and identified by Lieutenant Knott through the back sliding glass door. Officer Mercalde threatened to break the door in and defendant in turn threatened to shoot the first officer through the door. While this may have been the first time defendant had spent the night with Cheri Carter at 2103 Palisades Plaza, he clearly was an overnight guest. See Olson, 495 U.S. at 99 ("We are at our most vulnerable when we are asleep because we cannot monitor our own safety or the security of our belongings. It is for this reason that, although we spend all day in public places, when we cannot sleep in our own home we seek out another private place to sleep, whether it be a hotel room, or the home of a friend. Society expects at least as much privacy in these places as in a telephone booth – 'a temporarily private place whose momentary occupants' expectations of freedom from intrusion are recognized as reasonable.") (citations omitted).

The basis for the police officers entering 2103 Palisades Plaza after all known occupants had come out of that location was the asserted need for a protective sweep. A protective sweep is "a quick and limited search of premises, incident to arrest and conducted

-2-

to protect the safety of police officers or others." Sharrar v. Felsing, 128 F.3d 810, 822 (3d Cir. 1997) (quoting Maryland v. Buie, 494 U.S. 325, 327 (1990)). It is limited to a search of "closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched." Id. (quoting Buie, 494 U.S. at 334). "If the search goes beyond the immediately adjoining areas, there must be 'articulable facts' which would warrant a reasonably prudent officer to believe that there are individuals who pose a danger in other areas of the house." Id. at 822-23 (citing Buie, 494 U.S. at 334).

The appellate authority is uniform that when a suspect is arrested just outside the home, the reasoning of Buie is applicable and protective sweeps of the home are not *per se* unreasonable. Id. at 823 (collecting cases in support). The appellate courts "also agree that a sweep incident to an arrest occurring just outside the home must be analyzed under the second prong of the Buie analysis requiring 'articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene.'" Id. at 824 (quoting Buie, 404 U.S. at 334). This is the controlling standard in this jurisdiction as well. Id.

In general, an articulable basis to support the belief that there is a reasonable possibility that another individual who poses danger is in the premises or in the immediate area is all that is required for a protective sweep following an arrest just outside the home. Id. (citing United States v. Kimmons, 965 F.2d 1001, 1009-10 11th Cir. 1992). "The reasonable possibility that an associate of the arrestees remains at large to do mischief or cause danger to the officers is the salient, although not necessarily [the] only, concern for which a warrantless protective sweep is justified." Id. But the officers' lack of information or possession of no information concerning such a possibility cannot supply the articulable basis needed for the sweep in the first instance. Id. (quoting United States v. Colbert, 76 F.3d 773, 778 (6th Cir. 1996) ("'No information' cannot be an articulable basis for a sweep that requires information to justify it in the first place.").

The testimony of the government's witnesses failed to establish specific articulable

facts which would lead a reasonably prudent officer to believe there was a reasonable possibility that another individual who could pose a danger to the officers or others on the scene was inside 2103 Palisades Plaza. Cheri Carter refused to give Officer Mercalde access to the apartment and Officer Mercalde did hear a male voice threaten to shoot the first officer through the door after Mercalde threatened to break the door in to execute the warrant for defendant's arrest. Defendant was positively identified from the rear of the apartment by other officers containing the rear door. It was clear at this point that defendant was inside, the officers had been denied access, and a male had threatened to shoot any officer forcing his or her way into the apartment. This led to a decision to call the "S.W.A.T." team and "treat the matter as a hostage situation." Defendant was believed to be part of a street gang from a nearby neighborhood and from the beginning the officers on the scene had a concern that if one of defendant's comrades or associates were to appear at the scene, this could cause the situation to escalate. But as the night progressed no other information suggested that more than one male was in the apartment and all information that came to light indicated that defendant was the only male inside.

When the S.W.A.T. arrived and eighteen officers secured the scene, they set up an inside and outside perimeter. The inside perimeter encompassed the outside of the apartment while the outside perimeter secured the several blocks surrounding the scene. There was no sighting of any unauthorized individual passing through the outside perimeter and gaining access to the scene. There was no reason to believe any individual had remained inside the outside perimeter when the area was cordoned off and secured.

All information gained about the inside of the apartment indicated defendant was the only male inside. After a negotiator arrived and a secured line was established, several conversations occurred between the primary negotiator, Detective Lewis, and Cheri Carter and defendant. Detective Lewis' primary responsibility was to gather intelligence information about the situation inside. Lewis had lengthy conversations with Carter and defendant, with the first lasting approximately fifteen minutes. Cheri Carter indicated repeatedly the she, her two children and defendant were the only individuals inside. Throughout the ongoing

-4-

conversations Lewis focused on the occupants coming out of the apartment. All information gained by Lewis indicated defendant was the only male inside. All information gained by the officers in surveillance positions was consistent with this understanding and no information was generated to suggest otherwise. After daylight, Cheri Carter walked out with her two children at the suggestion of Detective Lewis and then defendant came out and peacefully surrendered to the police.

Each officer called to testify for the government was forced to admit on cross examination that they had no specific information suggesting any other individual was inside the apartment. Each admitted that the only basis for assuming that another individual might be inside was past historical experience indicating that reliance on the facts and circumstances known about any particular situation may not always prove to be true in the end and that even individuals seemingly being held against their will may attempt to deceive police about the number and location of their captors. Officer Cline testified that the S.W.A.T. Team employs "a standard procedure in which we do a protective sweep and that is done with every – the residents of every structure that we have been – the SWAT Team has been involved with ... looking for other suspects, other victims, people hiding." And Detective Tallent corroborated this approach by offering testimony concerning the "plus-one" rule of police training, which requires the officers at a scene treated as a hostage situation to always assume that the structure holds one additional individual besides all known occupants. Under this approach the officers had discovered in the past individuals not known to be present to be hiding in hollowed-out furniture and other fairly unique places. Such tactical clearings are done as a matter of course in order to assure that the premises is safe and can be turned back over to the civilian entitled to possession, and, according to Detective Tallent, such an assessment can only be made as a matter of fact after Detective Tallent and the other members of the entry team canvas all locations inside a structure wherein an individual might hide.[1]

---

1. Detective Tallent and four other members of the entry team entered 2103 Palisades Plaza after defendant surrendered and within "five or six minutes" the five of them searched in every

Of course, historical experience about other past situations and events cannot without more supply the specific and articulable facts needed to support a belief that in the present situation there is a reasonable possibility that another individual who may launch an attack against the police is inside. Nor can the mere prior gang association of the individual who has been arrested. And while the officers only knew that a male voice had threatened to shot the first police officer through the door, all specific information gained throughout the night indicated defendant, Cheri Carter and her two children were the only occupants of 2103 Palisades Plaza that night. This was a considerable amount of information, including the initial local officers' positive identification of defendant being inside, the conversations with Cheri Carter and defendant throughout the night, the account provided by Cheri Carter's mother, the intelligence gathered from observation and surveillance, and so forth. There simply was no contrary information or facts to suggest otherwise.

A protective sweep conducted on the premise that a male voice had threatened the officers from inside and they could not eliminate the possibility that there might have been another male inside, without any specific facts and inferences creating a reasonable suspicion that such was the case, is nothing more than a search based on no information. And while the police may have believed they needed to forgo asking Cheri Carter permission to search the premises based on their historical experience and training in order to eliminate immediately any doubt concerning their safety and the safety of the general public upon return of the premises to Cheri Carter, they were not at liberty to do so without obtaining that consent or a

---

such location in the small two bedroom apartment.

-6-

warrant. Accordingly, the seizure of the gun and marijuana must be suppressed from use in the government's case-in-chief.[2]


David Stewart Cercone
United States District Judge


cc:     Gregory J. Nescott, AUSA
        Michael J. Novara AFPD
        United States Marshal's Office
        United States Probation Office

---

2. Because defendant's motion to suppress must be granted due to the officers' lack of a specific articulable basis to support the belief that there was a reasonable possibility that another individual who posed a danger was in 2103 Palisades Plaza, we need not address the serious credibility issues raised about where and how Detective Tallent discovered the gun during his and four other officers' five to six minute "sweep" of all areas that could harbor a hiding individual within the small two bedroom apartment.